# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **TERRI TOMLINSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **vs.** | )   **No.  08-CV-259-TCK (FHM)** |
| | ) |
| | ) |
| **COMBINED UNDERWRITERS LIFE** | ) |
| **INSURANCE COMPANY, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## OPINION AND ORDER

Now before the Court is the Motion for Summary Judgment (Doc. 79) filed by Defendants

Combined Underwriters Life Insurance Company ("Combined Underwriters"), Citizens, Inc.,

Citizens Insurance Company of America ("CICA"), Citizens National Life Insurance Company

("Citizens National"), Texas International Life Insurance Company ("TILIC"), and Actuarial

Management Resources, Inc. ("AMR").   As set forth in prior orders, this case arises out of a dispute

concerning claims submitted and benefits payable under a Cancer and Dread Disease Insurance

Policy ("the Policy") issued to Plaintiff Terri Tomlinson ("Plaintiff").   Plaintiff initially asserted

claims for breach of contract, bad faith and negligence.   She later stipulated to dismissal of her

negligence claim and conceded the summary judgment motion of defendant AMR.   The Court

permitted Plaintiff to add Austin Insurance Management, Inc. ("Austin Insurance") as a defendant,

and Austin filed a separate motion for summary judgment.[1]   For purposes of the summary judgment

---

[1] Defendants Citizens, Inc, CICA and Citizens National also filed a motion for summary judgment arguing that the Court should not pierce the corporate veil of certain defendants and hold them liable for breach of contract or bad faith in this case.   Plaintiff argues that this is a violation of the local rules prohibiting more than one motion under Fed. R. Civ. P. 56 (*see* N.D. LCvR 56.1).   Defendants concede the violation; however, they point out that Plaintiff's veil-piercing claims are moot if no liability is found on the breach of contract and bad faith claims. The Court finds that Defendants' violation of LCvR 56.1 does not merit striking of the pending

motion before the Court, references to "Defendants" are to all remaining defendants other than Austin Insurance.

## I.    Factual Background

### A.    Relationship Among Defendants

Although the relationship among the Defendants is more relevant to Plaintiff's veil-piercing claims, the following details may be helpful to an understanding of the issues in this case. Combined Underwriters issued the Policy in 1991 to Plaintiff's former husband, under which Plaintiff was also an insured.  Citizens, Inc. purchased Combined Underwriters in 2002, and gave the stock of Combined Underwriters to CICA, a subsidiary of Citizens, Inc.  CICA designated Combined Underwriters to be its subsidiary and changed Combined Underwriters' name to Citizens National in 2004.  Citizens National and TILIC entered into a "Coinsurance Reinsurance Agreement" in December of 2004 whereby TILIC assumed the role of a co-insurer and reinsurer for a group of insurance policies that included the Policy at issue here.  Austin Insurance is the parent corporation of TILIC.  TILIC hired (the now-dismissed) AMG to administer Plaintiff's claims.

### B.    Denial of Claims

Plaintiff has a family history of cancer and was first diagnosed herself with breast cancer in 1997.  She submitted expenses to Combined Underwriters and received policy benefits.  Plaintiff was again diagnosed with breast cancer in June of 2004.

#### 1.    Drugs

From December 2004 to March 2005, Plaintiff had chemotherapy treatments.  Plaintiff telephoned Citizens National to inquire about whether the drugs Neupogen or Neulasta would be

---

motions for summary judgment without ruling on the merits, as requested by Plaintiff.

covered under the Policy.  A memorandum by the employee taking the call indicated that these drugs would be covered if used for definitive cancer treatment.  The employee also requested that Plaintiff's doctor send a statement to the insurer.  Plaintiff's doctor, Allen M. Keller, explained in a letter dated January 14, 2005, that he administered the Neupogen and Neulasta to her "to support bone marrow recovery so that chemotherapy can be given on the denser schedule."  (*Id.*, Ex. 8.)

Plaintiff submitted a claim in February 22, 2005.  The bill for chemotherapy lists codes for chemotherapy treatments which differ from codes for Neupogen and Neulasta treatments, and the differing treatments were never given on the same day.  After Plaintiff called the insurer to inquire as to whether the Neupogen would be covered, TILIC representative Suzie Ortiz called the office of Plaintiff's physician to inquire about the Neupogen and Neulasta.  A nurse told Ortiz that the treatments were given to increase Plaintiff's blood count. (*Id.*, Ex. 8.)  In emails to another representative, Ortiz admits that she was not sure of the meaning of Policy terms "antigenic preparations" and "immunosuppressive techniques."  (Resp. Br., Doc. 111, Exs. 33, 34.)

On March, 2, 2005, TILIC requested a medical review of the Neupogen/Neulasta issue by Medical Review Institute of America ("MRIA").  ( Resp. Br., Doc. 111, Ex. 36.)  On March 3, 2005, an internal medicine physician concluded that Neupogen/Neulasta would not be covered by the Policy.  (*Id.*, Ex. 37.)  TILIC relied upon the MRIA physician review to support its denial of benefits for Neupogen and Neulasta.  The insurer tendered a check to Plaintiff for $25,179.00 of the $82,811.36 in submitted expenses on March 2, 2005 and explained its decision in a letter to Plaintiff dated March 4, 2005.

On March 8, 2005, Plaintiff complained to the Oklahoma Department of Insurance ("DOI") about the denial of her claim for Neupogen and Neulasta and submitted a letter from her treating

3

oncologist regarding the use of these drugs.  The letter indicates that Plaintiff's chemotherapy program "is now considered standard therapy for women with her stage of breast cancer. . . . and cannot be administered in this fashion without all components of the program including the Neulasta."  (Mot. Summ. J., Doc. 79, Ex. 15.)  Nonetheless, the DOI responded again with a determination that "[b]ased upon the information contained in [TILIC's] letter, the claim would appear to have been processed in accordance with the terms of your policy." (*Id.,* Ex. 16.)

On March 30, 2005, TILIC requested that MRIA provide an oncologist review of the Neupogen/Neulasta issue.  On March 31, 2005, the reviewing oncologist authored a report in which the oncologist states that Neupogen and Neulasta, "are an integral part of the chemotherapy treatment program.  Without either Neupogen or Neulasta chemotherapy doses often have to be reduced, cycles delayed, or both.  These agents allow the use of full dose chemotherapy on schedule." (Resp. Br., Doc. 111, Ex. 43.) The physician also noted that supportive care medications are not excluded in the applicable policy provisions.  The reviewer also disagreed with the previous review and stated: "This should be considered part of the chemotherapy regimen.  It should be certified."  (*Id.* at 2-3.)

TILIC did not disclose the report to Plaintiff or the DOI in the pending complaint process.  Instead, TILIC faxed two questions challenging the findings of the MRIA physician and conducted a subsequent teleconference.  There is some handwritten notation in the record indicating that someone did not want the conversation recorded.  On April 4, 2005, the reviewing physician changed his opinion and concluded that, given "additional information from the carrier regarding the plan's coverage, Neupogen or Neulasta would not be a covered benefit as it does not *directly*

destroy or modify cancerous tissue." (*Id.*, Ex. 44 (emphasis added).)  TILIC notified Plaintiff of the decision on April 16, 2005.

In May 2005, Plaintiff also submitted claims under the Policy for the drug Arimidex, which is a hormone therapy drug.  Plaintiff's doctor prescribed the drug for her and she had the prescription filled at a pharmacy.  TILIC denied the claim based on its determination that the drug was not "administered" by a chemotherapist but "self-administered" by Plaintiff.

### 2.    Breast Surgeries

In 2000, 2001, and 2002, Combined Underwriters forwarded notices of certain insurance benefits made mandatory by the State of Oklahoma which were applicable to the Policy.   The notices provided the following with respect to reconstructive breast surgery:

> Reconstructive breast surgery as the result of a partial or total mastectomy will be covered, except as prohibited by Federal law or regulations pertaining to Medicaid. Reconstructive breast surgery includes:
>
> > (a) reconstruction of the breast on which the mastectomy was performed;
> >
> > (b) surgery and reconstruction of the other breast to achieve a symmetrical appearance, provided it is performed within 24 months of reconstruction of the breast on which the mastectomy was performed;
> >
> > (c) prosthesis and treatment of physical complication, including lymphedemas, at all stages of mastectomy.

(*Id.*, Ex. 7.)

On August 4, 2004, she underwent bilateral mastectomies.  Plaintiff made an insurance claim for $25,338.55 on the Policy, but Citizens National tendered a check to her for only $4,203.75. Plaintiff called Citizens National in October 2005 to inquire as to the insurance coverage for her breast prosthesis and was told that the Policy covers "only the prosthesis" and "nothing else." (*Id.*,

5

Ex. 28.)   Plaintiff filed a complaint with the DOI on November 3, 2004.   Citizens National responded to the DOI's inquiry, and DOI responded with a letter to Plaintiff stating that," [b]ased upon the information contained in [TILIC's] letter, the claim would appear to have been processed in accordance with the terms of your policy."  (Mot. Sum. J. Doc. 79, Ex. 7.)

On June 12, 2005, Plaintiff submitted a claim under the Policy's breast prosthesis benefit for the second stage of her breast reconstruction performed on May 26, 2005.  TILIC initially tendered a check for $3,007.64, which included payment only for the prostheses and their implantation.  The payment represents a denial of $13,184.35 of the $16,191.99 submitted as expenses.  Plaintiff points out that Ortiz initially erred in responding to an email by another TILIC employee as to whether surgery to both breasts would be covered, but the next day Ortiz sent an email acknowledging the Oklahoma law mandating insurance coverage for surgery to both breasts.  (See Resp. Br., Doc. 111, Ex. 50.)  TILIC made a supplemental payment on August 7, 2005, in the amount of $3,750.00 for the second stage reconstruction surgery of May 26, 2005.

Plaintiff again turned to the DOI, claiming that her breast prosthesis benefit covered all charges, including hospital confinement and anesthesia services, not just the actual cost of the breast prostheses and their implantation. TILIC responded to the DOI's investigation, explaining its view that the Policy covers in full only the actual charge for the prosthesis and the fee charged by the surgeon for implanting the prosthesis.  However, the benefits payable under the Policy also included one day of hospital room benefit, an additional 15% for drugs and medicines billed by the hospital, and a miscellaneous hospital benefit of 10% of the room benefit for other hospital expenses.  TILIC admitted that it had miscalculated her benefits based upon an inapplicable Policy limitation and she was due an additional payment for $2,131.85.  The DOI responded to Plaintiff's inquiry by stating

6

that it was in receipt of correspondence from TILIC and hoped that the information answered her concerns.

On December 29, 2005, Plaintiff had a revision of the left breast reconstruction performed. Plaintiff submitted a claim on January 18, 2006 for those services, and TILIC tendered a check for $1,875.00 of the $5,259.13 in submitted charges.

### 3.   Damages

The Policy was marketed as providing "benefits paid directly to [policyholder]," and "benefits paid in addition to all other coverage." (Resp. Br., Doc. 111, Ex. 3.) Plaintiff had a second supplemental cancer policy issued by American Fidelity Assurance Company ("American Fidelity"), and she had a primary health insurance policy through Blue Cross and Blue Shield of Oklahoma ("Blue Cross"). Blue Cross covered nearly all of her expenses except for approximately $1,750 per year for the same period. American Fidelity paid Plaintiff $126,831.61 in benefits under its policy from June 24, 2006 to May 8, 2006. Combined Underwriters and TILIC paid her $40,147.24 for the same period. Further, TILIC paid Plaintiff for her Neupogen, Neulasta, and Arimidex treatments after she filed her lawsuit. Plaintiff testified that she has suffered no economic loss from the denial of benefits by Combined Underwriters and TILIC, but TILIC representatives have testified that they would continue to deny similar future claims for Neupogen and Neulasta, and they have denied such claims to other Oklahoma policy holders. The parties dispute the relevancy and admissibility of the evidence relating to damages.

### 4.   Bad Faith Claim

With regard to her bad faith claims, Plaintiff submits the deposition testimony of Citizens, Inc.'s Vice-President of Claims and Rule 30(b)(6) witness, Sarah Morris, TILIC claims underwriter

Heike Cartwright, and TILIC auditor Susi Ortiz, who testified to various claim practices.  Among other things, these individuals testified to the lack of formal training provided by Citizens, Inc. and TILIC to claims staff.  She also submits the report of her expert witness, Jeffrey Gelona, to support her claim that Defendants breached their duty of good faith and fair dealing.[2]

**C.     Relevant Policy Provisions**

The "Schedule of Benefits" section of the Policy provides, in relevant part:

We will pay you the following benefits for the necessary treatment of cancer or a dread disease:

**A.  Hospital Confinement** —  We will pay you the daily room benefit amount shown on the policy schedule for each day you are confined in a hospital up to 60 days for one period of continuous hospital confinement.

* * *

**G.     Radiation, Radio-Active Isotopes Therapy, Chemotherapy, or Immunotherapy** — We will pay you the actual charges for the following treatment techniques provided they are used for the purpose of modification or destruction of cancerous tissue:

* * *

(3) Chemical substances and their administration including hormonal therapy;

* * *

Treatment must be administered by a Radiologist or a Chemotherapist.

* * *

**K.  Anesthesia** — We will pay actual charges, up to 25% of the Surgical Benefit, for the anesthetist.

---

[2]Defendants have moved to exclude Gelona's testimony (see Doc. 80), which the Court will address prior to trial.  Plaintiff does not appear to rely on the report in the argument portion of her response brief.  Accordingly, the Court does not deem it necessary to consider Gelona's report for purposes of summary judgment.

* * *

**N.  Breast Prosthesis** — We will pay you the actual charge for: (1) A prosthesis to restore body contour lost due to breast cancer; (2) the implantation of the prosthesis.

* * *

**W. Miscellaneous Hospital Expenses** — We will pay your actual hospital expenses which have not been paid under the applicable items A-T above.  We will pay up to 10% of the total benefit paid under Hospital Confinement (Item A).

(Mot. Summ J., Ex. 1, 4-6.)  The Policy also provides, in its section on "Exceptions and Other Limitations": "C.  We will not pay for any disease or incapacity that has been: caused; complicated; worsened; or, affected by cancer or a dread disease or as a result of cancer or dread disease treatment."  (*Id.* at 7.)

## II.     Analysis

### A.      Standard of Review

Summary judgment is proper only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The party seeking to overcome a motion for summary judgment must make a showing sufficient to establish the existence of those elements essential to that party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33, 106 S.Ct. 2548, 2553 (1986).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.  *See, e.g., Beard v. Bank*, 548 U.S. 521, 529-30, 126 S.Ct. 2572, 2578 (2006); *Turner v. Public Serv. Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009) (citation omitted).  However, the party seeking to overcome a motion for summary judgment "must still identify sufficient evidence requiring submission to the jury. . . . She cannot avoid summary judgment merely by presenting scintilla of evidence to support her claim; she must proffer

facts such that a reasonable jury could find in her favor." *Turner*, 563 F.3d at 1142 (citations omitted).

### B.        Breach of Contract

Under Oklahoma law, the interpretation and construction of insurance contracts constitutes an issue of law for the court to determine and resolve. *E.g., Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991); *Torres v. Sentry Ins.*, 558 P.2d 400, 401 (Okla. 1976) (citation omitted). Parties may contract for risk coverage at will and are bound by the policy terms to which they agree. *Dodson*, 812 P.2d at 376 (citing *Wiley v. Travelers Ins. Co.*, 534 P.2d 1293, 1295 (Okla. 1974)). The terms of the policy, "if unambiguous, clear, and consistent," are construed so as to give reasonable effect to all of its provisions, and these provisions are given their plain and ordinary meaning and import. *Id.* However, no "strained construction" or narrow focus upon any particular provision or term "will be indulged" so as to import a more favorable consideration to an insured. *Id.* To that end, courts do not rewrite policy language to extend coverage for a particular risk which is not intended to be covered. *See BP Am., Inc. v. State Auto Property & Cas. Ins. Co.*, 148 P.3d 832, 835-36 (Okla. 2005).

If the meaning of contract terms is uncertain, or the terms can bear more than one reasonable interpretation, the term is ambiguous and must be interpreted most favorably to the insured. *Dodson*, 812 P.2d at 376. Insurance policies, in particular, are considered "contracts of adhesion because of the uneven bargaining opposition of the parties," and the Court is to construe ambiguity or conflict in a policy strictly against the insurer. *E.g., Spears v. Shelter Mut. Ins., Co.*, 73 P.3d 865, 868 (Okla. 2003) (citation omitted); *Dodson*, 812 P.2d at 376 ("An insurance policy, like any other contract of adhesion, is liberally construed, consistent with the object sought to be accomplished,

10

so as to give a reasonable effect to all of its provisions, if possible."). Oklahoma applies the doctrine of reasonable expectations "to the construction of ambiguous insurance contracts or to contracts containing exclusions which are masked by technical or obscure language or which are hidden in policy provisions." *Max True Plastering Co. v. U.S. Fidelity and Guar. Co.*, 912 P.2d 861, 863 (Okla. 1996). "Under this doctrine, if the insurer or its agent creates a reasonable expectation of coverage in the insured which is not supported by policy language, the expectation will prevail over the language of the policy." *Id.,* 912 P.2d at 864. In other words, "when construing an ambiguity or uncertainty in an insurance policy, the meaning of the language is not what the drafter intended it to mean, but what a reasonable person in the position of the insured would have understood it to mean." *Spears*, 73 P.3d at 868.

### 1.    Neupogen and Neulasta

Defendants argue that Neupogen and Neulasta fall within the Policy's schedule of benefits because neither were administered to Plaintiff "for the purpose of modification or destruction of cancerous tissue . . . ." (Mot. Summ. J., Doc. 79, Ex. 1 at 4, §V, ¶ G.) Instead, they argue, Dr. Keller administered them to treat the side effects of chemotherapy which caused damage to her bone marrow and to increase her blood count. The coding for the treatment describes an injection for the long-term use of "other" high risk medications and not as the administration of a cytotoxic drug. Further, Defendants claim, coverage for the drugs must be denied because the Policy expressly states that no coverage is afforded for "any disease or incapacity that has been: . . . caused  . . . by cancer or dread disease or as a result of cancer or dread disease treatment."  (*Id.*, Ex. 1, at 7, §§ VII, ¶ C.) Since the decrease in blood count was caused by chemotherapy, Defendants assert, the Policy excludes coverage for the Neupogen and Neulasta used to increase Plaintiff's blood count.

11

The Court finds the relevant language of the Policy ambiguous. Accordingly, it must be interpreted most favorably to the insured and construed strictly against the insurer. Defendants themselves describe the decrease in blood count as a "condition," not a "disease or incapacity" caused by chemotherapy. Further, Plaintiff's treating oncologist and the MRIA reviewing oncologist both reported that the Neupogen and Neulasta are part of a chemotherapy treatment regimen which permits the physician to give Plaintiff a full dose of chemotherapy on schedule. While administration of these drugs is considered supportive therapy, a reasonable person in the position of the insured would have understood that Neupogen and Neulasta were a necessary component to a technique "used for the purpose of modification or destruction of cancerous tissue." (*Id.*, Ex. 1 at 4, §V, ¶G.)

As Plaintiff indicates, similar language in other cases has been construed in favor of the insured. In *du Mortier v. Massachusetts General Life Ins. Co.*, 805 F. Supp. 816 (C.D. Ca. 1992), for example, the court found that non-cytotoxic calibration drugs and other charges were covered by the following policy provision: "The company will pay the usual and customary charges for cancerocidal chemical substances and their administration for the purpose of modification or destruction of abnormal tissue . . ." *Id.* at 822. The court concluded that the provision covered not only the costs of the drugs and the physician's charge to administer them, but also the costs of calibrating the proper dosages and insuring that they are both effective and safe. *Id.* at 823.[3] This

---

[3] Similarly, in an unpublished opinion submitted by Plaintiff, another federal court has interpreted language almost identical to the language in the Policy at issue here "to provide benefits for all the drugs, solutions, supplies, testing, and medical attention required to deliver safe and effective chemotherapy to the patient." *Gloria Johnson, et al. v. Central States Health and Life Co. of Omaha*, CIV 00-4135 (D.S.D. July 9, 2001) (unpublished opinion) (See Resp. Br., Doc. 111, Ex. 64).

Court reaches a similar conclusion: the Policy creates a reasonable expectation in the insured that coverage exists for the Neupogen and Neulasta.

> ### 2. Arimidex

Similarly, the Policy creates a reasonable expectation in the insured that coverage exists for Arimidex. Arimidex is a brand name for anastrozole, an oral antiestrogen. It interferes with the production of estrogen which causes many breast cancer tumors to grow. *See, e.g.*, http://www.drugs.com/cons/arimidex.html. Plaintiff's treating oncologist prescribed the drug for her, and she had the prescription filled at a pharmacy. She testified that she "self-administered" it daily at home. (Mot. Summ. J., Ex. 2, Pl. Dep. 216:2-217:12.)

Defendants argue the Arimidex is not covered because Plaintiff self-administered it. Defendants rely on the language in the Policy's Schedule of Benefits which states that the insurer will pay for "[c]hemical substances and their administration including hormonal therapy;" but "[t]reatment must be administered by a Radiologist or a Chemotherapist." (Mot. Summ J., Ex. 1, p. 4, ¶ G.) They cite to a medical dictionary for the definition of "administration" which indicates that it means "the giving of a therapeutic agent." *Taber's Cyclopedic Medical Dictionary,* 46 (Venes ed., 19th ed. 1997). They also point to the use of the word "administer" in reference to an injection of insulin to a diabetic patient, *Application of Severns*, 335 P.2d 94, 95 (Okla. Crim. App. 1959), or to the giving or receiving of the drug Rho-GAM to a woman with Rh-negative blood. *Graham v. Keuchel*, 847 P.2d 342, 351 (Okla. 1993). These cases are inapposite if a reasonable person would expect the giving of medical treatment to include prescriptions for medication.

In further support of their arguments, Defendants cite to a Supreme Court case addressing the constitutionality of a Massachusetts law restricting access to contraceptives. *Eisenstadt v. Baird*,

405 U.S. 438, 461, 92 S.Ct. 1029, 1042 (1972).  Defendants contend that the Court recognized "the distinction between contraceptives that are 'administered' by a physician versus contraceptives that are 'prescribed' by a physician and bought from a pharmacist."  (Mot. Summ J. Doc. 79, at 10.)  A closer look at the case indicates, however, that the Court merely recited the Massachusetts law, which made it a criminal offense to distribute, sell, or give away contraceptive drugs but excepted "registered physicians who prescribe for and administer such articles . . . ." *Eisenstadt*, 405 U.S. at 461.  Indeed, the use of the terms in the Massachusetts law would seem to indicate that both terms involved the giving of a therapeutic agent or treatment.

Finally, Defendants cite to an article in the *Tulsa World* where the term "administer" is used in the context of medical treatment.  Yet, the only sentence where the term is used merely states "Psychiatric services for children require highly specialized doctors to administer complicated programs and medicine, . . ."  (Mot. Summ. J., Doc. 79, App. II., at 3, Joe Robertson, *Is a Doctor in the House?*, TULSA WORLD , Aug. 15, 1999.)[4]  This statement, in conjunction with the article's focus on the loss of programs for "private psychiatrists who try to prescribe and manage children's medications under Medicaid" could be interpreted to mean that doctors can "administer" a drug by prescribing it.

The Court is not persuaded by Defendants' narrow interpretation of the term "administer", nor by Defendants' argument that the Policy does not cover any hormonal therapy drug which can be "self-administered."  Defendants' own claims personnel testified that the drug would have been

---

[4]Another Tulsa World cited by Defendants and attached to Appendix II is barely legible, but appears to be a report about a massage therapist who "administers" detoxification treatments from a Holistic Wellness Clinic. (See Mot. Summ. J. App. II, Barbara Allen, *Get the Lead Out*, TULSA WORLD, Jan. 4, 2007.)  The Court does not consider this reference particularly helpful to a determination of the meaning of the term "administer" in the Policy at issue.

covered if Plaintiffs' treating physician had placed it on her tongue, rubbed it on her, put it in her eye with an eye drop or sprayed it into her nose with a nasal spray.  (Mot. Summ. J., Doc. 79, Ex. 5, Ortiz Dep., 116:1 - 120:2.)  Defense counsel's questioning of Plaintiff at deposition indicates that they might have paid for the Arimidex if the physician had handed her the Arimidex pill instead of prescribing it for her, and that the cost would be less if it were prescribed instead of being "administered in the office."  (*Id.*, Ex. 2, Tomlinson Dep. 220:2-19.)  The Court will not construe the Policy so narrowly as to prohibit coverage when a pill is prescribed for — and not handed to — a patient.  In this instance, the insurer has created a reasonable expectation in the insured that coverage exists.

### 3.    Breast Prosthesis

A reasonable person in the position of the Plaintiff would have understood the Policy to provide coverage for submitted charges related to her breast reconstruction.  Defendants claim that the Policy covers only the actual charge or a prosthesis and the implantation of the prosthesis under paragraph N of the Schedule of Benefits section.  (*See* Mot. Summ. J., Doc. 79, Ex. 1.)  Accordingly, they paid only for the prosthesis and the surgeon's fee to implant it.

Defendants' rationale for denying the claim overlooks the Oklahoma Breast Cancer Patient Protection Act, which provides, in relevant part:

> B. Any health benefit plan that is offered, issued or renewed in this state on or after January 1, 1998, that provides medical and surgical benefits with respect to the treatment of breast cancer and other breast conditions shall ensure that coverage is provided for *not less than forty-eight (48) hours of inpatient care following a mastectomy* and not less than twenty-four (24) hours of inpatient care following a lymph node dissection for the treatment of breast cancer.
>
> * * *
>
> D. Any plan subject to subsection B of this section shall also provide coverage for reconstructive breast surgery performed as a result of a partial or total mastectomy. Because breasts are a paired organ, any such reconstructive breast surgery shall

include coverage for *all stages of reconstructive breast surgery* performed on a nondiseased breast to establish symmetry with a diseased breast when reconstructive surgery on the diseased breast is performed, provided that the reconstructive surgery and any adjustments made to the nondiseased breast must occur within twenty-four (24) months of reconstruction of the diseased breast.

36 Okla. Stat. Ann. § 6060.5 (emphasis added). Section X of the Policy indicates that "Any provision of the policy which, on its effective date, is in conflict with the statutes of the state in which you reside on such date is hereby amended to conform to the minimum requirements of such statutes." (Mot. Summ. J., Doc. 79, Ex. 1, at 9.) It appears that the notices issued by Defendants in 2000, 2001, and 2002 were an effort to comply with paragraph F of the statute even though the statute is not specifically referenced in the notices. (*See* Resp. Br., Doc. 111, Ex. 7.)

Defendants contend that the Act merely requires the same coverage provided by the Policy for reconstruction of a cancerous breast be likewise afforded to the non-cancerous breast in order to create symmetry. This contention misconstrues the language of the statute, which requires coverage for inpatient care following a mastectomy and indicates that "any such reconstructive breast surgery (referring to reconstructive breast surgery performed as a result of a partial or total mastectomy) include coverage for *all stages* of reconstructive breast surgery performed on a non-diseased breast . . . ." 36 Okla. Stat. Ann. § 6060.5(D) (emphasis added). This implies that coverage for all stages of reconstructive surgery of the diseased breast must be provided as well.

Further, the Schedule of Benefits in the Policy provides that the insurer will pay for hospital confinement (¶ A), anesthesia up to 25% of the surgical benefit (¶ K), and miscellaneous hospital expenses up to 10% of the total benefit paid under the hospital confinement paragraph (¶ W). Defendants suggest in a footnote to their reply brief that Plaintiff received benefits for her breast reconstruction surgeries under other provisions of her policy, but they do not state which provisions.

16

They also assert that Plaintiff has admitted receiving such benefits and they characterize her claim as a claim that the "other" charges should not have been subject to policy limitations.   The Court does not find such admission or claim in her response brief.  In any event, the statute controls, and Defendants obligated themselves to pay for all stages of reconstructive breast surgery performed on Plaintiff.  Defendants' motion for summary judgment is denied as to Plaintiff's breach of contract claim.[5]

## B.     Bad Faith

"Every insurance contract carries with it the duty to act fairly and in good faith in discharging its contractual responsibilities." *Garnett v. Gov't Employees Ins. Co.*, 186 P.3d 935, 944 (Okla. 2008).  "A party prosecuting a claim of bad faith carries the burden of proof and must plead all the elements of the intentional tort." *Id.*  The essence of the tort is the unreasonable, bad-faith conduct of the insurer.  *See id*; *McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981).  "A central issue is whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are alleged to be violative of the duty of good faith and fair dealing." *See Garnett*, 186 P.3d at 944; *Buzzard v. Farmers Ins. Co., Inc.*, 824 P.2d 1105, 1109 (Okla. 1991). There is law in Oklahoma indicating that, if there is a legitimate dispute concerning coverage or no conclusive precedential legal authority on an issue, withholding payment is not necessarily unreasonable or in bad faith.  *Skinner v. John Deere Ins. Co.*, 998 P.2d 1219, 1223 (Okla. 2000). However, there is also Oklahoma law indicating that a "legitimate dispute as to coverage will not act as an impenetrable shield against a valid claim of bad faith or unreasonable conduct." *Haberman*

---

[5] Plaintiff did not move for summary judgment on her breach of contract claim.  Given the Court's interpretation and construction of the contract as a matter of law, the only remaining issue with regard to the breach of contract claim appears to be the amount of damages, if any.

*v. The Hartford Insurance Group*, 443 F.3d 1257, 1270 (10th Cir. 2006) (citations and internal quotations omitted).

"Before the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law, under the facts most favorably construed against the insurer, whether the insurer's conduct may be reasonably perceived as tortious." *See Garnett*, 2008 OK 43, ¶22, 186 P.3d at 944. "If there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of the insurer's conduct, what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *Newport v. USAA*, 11 P.3d 190, 195 (Okla. 2000) (quoting *McCorkle*, 637 P.2d at 586-87); *see Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005).

### 1.    Neupogen and Neulasta

Defendants argue that their denial of coverage for Neupogen and Neulasta was reasonable as they relied on the "plain language" of the Policy and the denial was based upon the evidence Plaintiff submitted with her claim.  In particular, they point to (a) the letter from Plaintiff's treating physician which indicates that Neupogen and Neulasta were supportive care to support bone marrow recovery; (b) the phone conversation in which the physician's nurse indicated that Neupogen and Neulasta were used to increase blood count, (c) the coding for the treatment on the physician's bill which described the drugs as injections for long-term, high risk medication, and not for chemotherapy; and (d) the DOI's determination that Plaintiff's claim was "processed in accordance with the terms of [her] policy."  (Mot. Summ. J., Doc. 79, Ex. 16.)  Defendants do not rely on the fact that they sought a medical review from a MRIA physician regarding coverage for these drugs and eventually received one indicating that the Policy did not provide coverage.

18

Plaintiff argues that her physician's letters should have put Defendants on notice that the drugs were a necessary part of her chemotherapy regimen which resulted in increased destruction or modification of her cancerous tissue and, thus, should have been covered under the Policy.[6]  She does not address the remainder of Defendants' evidence to support their position that they had justifiable reasons for withholding payment.  Elsewhere in her response brief, however, Plaintiff denies that the DOI letter was an actual determination agreeing with Defendants' coverage position.  She also denies that the Defendants relied on their insurance coding of medicine when they denied coverage.  Further, she asserts that the evidence regarding Defendants' call to the nurse is inadmissible hearsay.

Under the facts most favorably construed against the insurer, the insurer's conduct in denying coverage could reasonably perceived as tortious as there is some conflicting evidence from which different inferences may be drawn regarding the reasonableness of the insurer's conduct.  Specifically, Defendants' disregard for the opinion of Plaintiff's treating oncologist, Defendants' interaction with the MRIA to obtain a medical review of the issue, together with statements by Defendant employees handling Plaintiff's claim as to their knowledge, or lack thereof, regarding the terms of the Policy are issues for the trier of fact to consider.  The reasonableness of Defendants' actions presents a genuine issue of material fact.  Defendants' motion for summary judgment in this regard is denied.

---

[6] Plaintiff also argues that two other facts support her position that Defendants acted unreasonably and in bad faith: (1) Defendants paid for the Neupogen and Neulasta after the lawsuit began, and (2) her other supplemental insurance carriers paid for the same chemotherapy regimen.  These arguments are the subject of motions in limine filed by the Defendants.  Given the dispute over their admissibility, the Court declines to rely on them for purposes of summary judgment.

### 2.  Arimidex

Similarly, Defendants argue that they relied on the language of the Policy which required Arimidex to be administered by a radiologist or chemotherapist and the fact that Plaintiff admitted that she self-administered the drug.  Plaintiff's physician prescribed it for her and she had the prescription filled at a pharmacy.  The Court has found that the Defendants' interpretation of the Policy with regard to the Arimidex was too narrow; the trier of fact could find that it was unreasonably so.  Under the facts most favorably construed against the insurer, the insurer's conduct may be reasonably perceived as tortious.  Accordingly, summary judgment on this issue is denied.

### 3.  Breast Prosthesis

Defendants claim that Plaintiff breast reconstruction claim was not handled in bad faith because the applicable paragraph of the Policy, paragraph N, covers actual charges only for the prosthesis itself and the fee charged by the surgeon for implanting prosthesis.  As discussed above, they contend that the paragraph does not afford benefits for additional charges for the hospital, anesthesiologist, or anything else associated with the breast reconstruction surgery.  Defendants suggest elsewhere in their briefing that they may have relied on other paragraphs in the Policy to provide coverage, within certain limitations, for these additional charges.  They also argue that the DOI agreed with them on this issue twice.

The Court does not rely on the DOI's responses to Plaintiff's complaints as any determination that the Defendants' interpretation is correct or reasonable. The Court has found that Defendants' interpretation of the applicable Policy provision was too narrow and in conflict with statutory law in Oklahoma. Given the statute, other provisions of the Policy, and Defendants' representations to Plaintiff, a reasonable fact-finder could deem Defendants' denial of coverage as

to this claim a violation of the duty of good faith and fair dealing.  Summary judgment will be denied.

### C.     Public Policy

Defendants argue that public policy requires summary judgment against Plaintiff because she has suffered no economic loss from the denials of benefits or the alleged improper handling of her claims.  Defendants point out that she had two supplemental cancer policies and a primary health insurance policy.  Her primary policy with Blue Cross covered nearly all of her expenses for the relevant period and her supplemental cancer policies through American Fidelity and Combined Underwriters covered more than her yearly out-of-pocket expenses for her cancer treatments and surgeries.

Specifically, Defendants argue that it is against public policy for Plaintiff to seek damages against both American Fidelity and Combined Underwriters for the alleged failure to pay identical benefits for a single illness, where the treatment was actually paid for by the Blue Cross.  In support of this argument, Defendants cite to an Oklahoma statute indicating that insurance contracts are for indemnity only, 36 Okla. Stat. §102 (2001), and not for compensation "above-and-beyond" the loss suffered.  Defendants cite to an Indiana case holding that *property* cannot be doubly insured and, if it is, the supplemental policy "is in effect a gambling contract and is void as against public policy." *Loving v. Ponderosa Systems, Inc.*, 479 N.E. 2d 531, 536 n. 1 (Ind. 1985) (citations omitted).  The court reasoned that gambling contracts are void because they have the tendency to create a desire for the event insured against and furnish strong temptation to bring it about." *Id.* (citation omitted).  It cannot be argued that health insurance policies are similar in this respect to

property insurance policies, as no reasonable person desires the illness or injury that health insurance policies are designed to cover.

Defendants also reference a Mississippi case described in *Time Ins. v. Sams*, 692 F.Supp. 663, 671 (N.D. Miss. 1988), "where the plaintiff bought ten separate policies of health and accident insurance. The court referenced in *Sams* voided the policies and found the 'shocking overinsurance . . .obviously contrary to the purpose of insurance and to the public policy of Mississippi.'" *Id.* at 671. Defendants fail to point out that the *Sams* court distinguished the case quoted therein based on the number of policies involved and the type of coverage provided. The *Sams* court actually held that "the Mississippi Supreme Court, if called upon to so hold, would not rule that multiple coverages for accident and health losses violates the public policy of Mississippi." *Id.* at 670. The court reasoned, in part, that insurance carriers can draft other insurance or "coordination of benefits" clauses into their policies to guard against situations where an insured can recover more than his or her expenses. The defendants in *Sams* attempted to draft such a clause into the policy at issue, but the court found that the coordination of benefits language in the insured's contact was not adequate to provide the result the defendant insurer desired. *Id.* at 667. The court also found that the insurer's attempt to limit its liability under such language conflicted with a regulation promulgated by the Mississippi Commissioner of Insurance. *Id.* at 667-68[7]

---

[7] The only Oklahoma case to which Defendants cite is *Haws v. Luethje*, 503 P.2d 871, 876 (Okla. 1972). Insurance coverage was not at issue in *Haws*; this issue was whether the executrix of a decedent's estate could bring a wrongful death action after the decedent had executed a release of claims for personal injuries that led to his death. *Id.* The court found that double recovery would not be permitted based upon the single wrongful act. *See id.* Significantly, the case involved only one tortfeasor. The Court finds *Haws* inapposite to the issues presented in this case.

Defendants' argument in this case conflicts with regulations in Oklahoma regarding the coordination of benefits, *i.e.*, where an insurance company reduces benefits otherwise payable under a policy because of the availability of other insurance coverage. *See* Okla. Admin. Code § 365:10-11-2(I). The Code provides, in relevant part:

> It is contrary to the public policy of this state for a Plan to declare its coverage to be "excess" to all others, or always "secondary," or to reduce its benefits because of the existence of duplicate coverage in a manner other than as permitted by this regulation; or to reduce its benefits because a person covered by the Plan is eligible for any other coverage.

*Id.*, 365:10-11-1. Oklahoma forbids the coordination of benefits unless an insurer includes a written disclosure in the policy informing the policyholder that benefits may be reduced to the extent of other applicable coverage. *Id.* at 365:10-5-3(B). It is undisputed that the Policy contained no such disclosure. "W[]here two or more insurance policies cover the same hazard and do not provide for coordination of benefits, each policy is primary, and each insurer must pay 'all medical expenses that qualify for payment under the policy or plan.'" *Nahom v. Blue Cross and Blue Shield of Ariz., Inc.*, 885 P.2d 1113, 1119 (Ariz. Ct. App. 1994) (citation and internal quotation omitted). The Court can find no clear authority indicating that the public policy of Oklahoma prohibits the recovery sought by Plaintiff in this case.[8]

---

[8] Defendants include in their motion a section in which they argue that no violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d occurred. Apparently, Plaintiff asserted during a deposition that Defendants may have violated her right to privacy under HIPAA when the TILIC representative called her treating physician's office concerning the use of Neupogen and Neulasta in her chemotherapy. Plaintiffs did not respond in her response brief, and the Court can find no allegation regarding this issue in the Complaint, the Amended Complaint, or Plaintiff's Trial Brief. Consequently, the Court considers this issue conceded by Plaintiff.

### III.    Conclusion

For the reasons stated herein, the Motion for Summary Judgment (Doc. 79) filed by

Defendants Combined Underwriters, Citizens, Inc., CICA, National, and TILIC, and AMR is hereby

DENIED.


**ORDERED this 9th day of April, 2010.**


_Terence C Kern_

**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**